# AMCHEM PRODUCTS, INC., ET AL. *v.* WINDSOR ET AL.

No. 96–270.   Argued February 18, 1997—Decided June 25, 1997

592

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which

STEVENS, J., joined, *post*, p. 629.   O'CONNOR, J., took no part in the consideration or decision of the case.

Stephen M. Shapiro argued the cause for petitioners. With him on the briefs were *John D. Aldock, Elizabeth Runyan Geise, Richard M. Wyner, Kenneth S. Geller, Andrew J. Pincus, Charles A. Rothfeld, Eileen Penner, Robert H. Bork, Max Gitter, Blake Perkins,* and *Nancy B. Stone.*

Laurence H. Tribe argued the cause and filed a brief for respondent Windsor et al.   With him on the brief were *Brian Koukoutchos, Jonathan S. Massey, Frederick M. Baron, Brent M. Rosenthal,* and *Steve Baughman. Brad Seligman, Jocelyn D. Larkin, Donna M. Ryu, Sharon R. Vinick,* and *Steven Kazan* filed a brief for respondent Cargile et al.   *Shepard A. Hoffman* filed a brief for respondent Balonis et al.   *Ronald L. Motley, Joseph F. Rice, Nancy Worth Davis, Gene Locks,* and *Jonathan W. Miller* filed a brief for respondent Georgine et al.   *Brian Wolfman* and *Alan B. Morrison* filed a brief for respondent White Lung Association of New Jersey et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the National Association of Securities and Commercial Lawyers by *Kevin P. Roddy, Clinton A. Krislov,* and *Robert J. Stein III;* for the Chamber of Commerce of the United States by *John H. Beisner, Brian D. Boyle, Stephen A. Bokat,* and *Robin S. Conrad;* for Rhone-Poulenc Rorer Inc. et al. by *Carter G. Phillips, Richard L. Berkman,* and *Fred T. Magaziner;* and for the Washington Legal Foundation by *Daniel J. Popeo.*

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Dennis C. Vacco,* Attorney General of New York, *Barbara Gott Billet,* Solicitor General, *Shirley F. Sarna, Nancy Spiegel, Joy Feigenbaum,* and *Jane M. Kimmel,* Assistant Attorneys General, *Daniel E. Lungren,* Attorney General of California, *Thomas F. Gede,* Special Assistant Attorney General, and *Albert Norman Shelden,* Supervising Deputy Attorney General, *Charles P. C. Ruff,* Corporation Counsel of the District of Columbia, and by the Attorneys General of their respective jurisdictions as follows: *Winston Bryant* of Arkansas, *M. Jane Brady* of Delaware, *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Albert B. Chandler III* of Kentucky, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Ne-

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the legitimacy under Rule 23 of the Federal Rules of Civil Procedure of a class-action certification sought to achieve global settlement of current and future asbestos-related claims. The class proposed for certification potentially encompasses hundreds of thousands, perhaps millions, of individuals tied together by this commonality: Each was, or some day may be, adversely affected by past exposure to asbestos products manufactured by one or more of 20 companies. Those companies, defendants in the lower courts, are petitioners here.

The United States District Court for the Eastern District of Pennsylvania certified the class for settlement only, finding that the proposed settlement was fair and that representation and notice had been adequate. That court enjoined class members from separately pursuing asbestos-related personal-injury suits in any court, federal or state, pending the issuance of a final order. The Court of Appeals for the Third Circuit vacated the District Court's orders, holding that the class certification failed to satisfy Rule 23's requirements in several critical respects. We affirm the Court of Appeals' judgment.

I

A

The settlement-class certification we confront evolved in response to an asbestos-litigation crisis. See *Georgine* v. *Amchem Products, Inc.*, 83 F. 3d 610, 618, and n. 2 (CA3 1996) (citing commentary). A United States Judicial Con-

_____

vada, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *James S. Gilmore III* of Virginia, and *Calvin E. Holloway, Sr.*, of Guam; for the Asbestos Victims of America by *Maynard Ungerman;* for the Association of Trial Lawyers of America by *Jeffrey Robert White* and *Howard F. Twiggs;* for Law Professors by *Charles Silver* and *Samuel Issacharoff;* for Owens-Illinois, Inc., by *James D. Miller;* and for Trial Lawyers for Public Justice by *Leslie A. Brueckner* and *Arthur H. Bryant.*

ference Ad Hoc Committee on Asbestos Litigation, appointed by THE CHIEF JUSTICE in September 1990, described facets of the problem in a 1991 report:

> "[This] is a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s. On the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related diseases, a continuing stream of claims can be expected. The final toll of asbestos related injuries is unknown. Predictions have been made of 200,000 asbestos disease deaths before the year 2000 and as many as 265,000 by the year 2015.
>
> "The most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether." Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation 2–3 (Mar. 1991).

Real reform, the report concluded, required federal legislation creating a national asbestos dispute-resolution scheme. See id., at 3, 27–35; see also id., at 42 (dissenting statement of Hogan, J.) (agreeing that "a national solution is the only answer" and suggesting "passage by Congress of an administrative claims procedure similar to the Black Lung legislation"). As recommended by the Ad Hoc Committee, the Judicial Conference of the United States urged Congress to act. See Report of the Proceedings of the Judicial Conference of the United States 33 (Mar. 12, 1991). To this date, no congressional response has emerged.

In the face of legislative inaction, the federal courts—lacking authority to replace state tort systems with a national toxic tort compensation regime—endeavored to work with the procedural tools available to improve management of federal asbestos litigation. Eight federal judges, experienced in the superintendence of asbestos cases, urged the Judicial Panel on Multidistrict Litigation (MDL Panel), to consolidate in a single district all asbestos complaints then pending in federal courts. Accepting the recommendation, the MDL Panel transferred all asbestos cases then filed, but not yet on trial in federal courts to a single district, the United States District Court for the Eastern District of Pennsylvania; pursuant to the transfer order, the collected cases were consolidated for pretrial proceedings before Judge Weiner. See *In re Asbestos Products Liability Litigation (No. VI)*, 771 F. Supp. 415, 422–424 (JPML 1991).[1] The order aggregated pending cases only; no authority resides in the MDL Panel to license for consolidated proceedings claims not yet filed.

B

After the consolidation, attorneys for plaintiffs and defendants formed separate steering committees and began settlement negotiations. Ronald L. Motley and Gene Locks—later appointed, along with Motley's law partner Joseph F. Rice, to represent the plaintiff class in this action—cochaired the Plaintiffs' Steering Committee. Counsel for the Center for Claims Resolution (CCR), the consortium of

---

[1] In a series of orders, the MDL Panel had previously denied other asbestos-case transfer requests. See *In re Asbestos and Asbestos Insulation Material Products Liability Litigation*, 431 F. Supp. 906, 910 (JPML 1977); *In re Asbestos Products Liability Litigation (No. II)*, MDL–416 (JPML Mar. 13, 1980) (unpublished order); *In re Asbestos School Products Liability Litigation*, 606 F. Supp. 713, 714 (JPML 1985); *In re Ship Asbestos Products Liability Litigation*, MDL–676 (JPML Feb. 4, 1986) (unpublished order); *In re Leon Blair Asbestos Products Liability Litigation*, MDL–702 (JPML Feb. 6, 1987) (unpublished order).

20 former asbestos manufacturers now before us as petitioners, participated in the Defendants' Steering Committee.[2] Although the MDL Panel order collected, transferred, and consolidated only cases already commenced in federal courts, settlement negotiations included efforts to find a "means of resolving ... future cases." Record, Doc. 3, p. 2 (Memorandum in Support of Joint Motion for Conditional Class Certification); see also *Georgine* v. *Amchem Products, Inc.*, 157 F. R. D. 246, 266 (ED Pa. 1994) ("primary purpose of the settlement talks in the consolidated MDL litigation was to craft a national settlement that would provide an alternative resolution mechanism for asbestos claims," including claims that might be filed in the future).

In November 1991, the Defendants' Steering Committee made an offer designed to settle all pending and future asbestos cases by providing a fund for distribution by plaintiffs' counsel among asbestos-exposed individuals. The Plaintiffs' Steering Committee rejected this offer, and negotiations fell apart. CCR, however, continued to pursue "a workable administrative system for the handling of future claims." *Id.*, at 270.

To that end, CCR counsel approached the lawyers who had headed the Plaintiffs' Steering Committee in the unsuccessful negotiations, and a new round of negotiations began; that round yielded the mass settlement agreement now in controversy. At the time, the former heads of the Plaintiffs' Steering Committee represented thousands of plaintiffs with then-pending asbestos-related claims—claimants the parties

---

[2] The CCR Companies are Amchem Products, Inc.; A. P. Green Industries, Inc.; Armstrong World Industries, Inc.; Asbestos Claims Management Corp.; Certainteed Corp.; C. E. Thurston & Sons, Inc.; Dana Corp.; Ferodo America, Inc.; Flexitallic, Inc.; GAF Building Materials, Inc.; I. U. North America, Inc.; Maremont Corp.; National Services Industries, Inc.; Nosroc Corp.; Pfizer Inc.; Quigley Co.; Shook & Fletcher Insulation Co.; T & N, PLC; Union Carbide Corp.; and United States Gypsum Co. All of the CCR petitioners stopped manufacturing asbestos products around 1975.

to this suit call "inventory" plaintiffs. CCR indicated in these discussions that it would resist settlement of inventory cases absent "some kind of protection for the future." *Id.*, at 294; see also *id.*, at 295 (CCR communicated to the inventory plaintiffs' attorneys that once the CCR defendants saw a rational way to deal with claims expected to be filed in the future, those defendants would be prepared to address the settlement of pending cases).

Settlement talks thus concentrated on devising an administrative scheme for disposition of asbestos claims not yet in litigation. In these negotiations, counsel for masses of inventory plaintiffs endeavored to represent the interests of the anticipated future claimants, although those lawyers then had no attorney-client relationship with such claimants.

Once negotiations seemed likely to produce an agreement purporting to bind potential plaintiffs, CCR agreed to settle, through separate agreements, the claims of plaintiffs who had already filed asbestos-related lawsuits. In one such agreement, CCR defendants promised to pay more than $200 million to gain release of the claims of numerous inventory plaintiffs. After settling the inventory claims, CCR, together with the plaintiffs' lawyers CCR had approached, launched this case, exclusively involving persons outside the MDL Panel's province—plaintiffs without already pending lawsuits.[3]

## C

The class action thus instituted was not intended to be litigated. Rather, within the space of a single day, January 15, 1993, the settling parties—CCR defendants and the representatives of the plaintiff class described below—presented to the District Court a complaint, an answer, a pro-

---

[3] It is basic to comprehension of this proceeding to notice that no transferred case is included in the settlement at issue, and no case covered by the settlement existed as a civil action at the time of the MDL Panel transfer.

posed settlement agreement, and a joint motion for conditional class certification.[4]

The complaint identified nine lead plaintiffs, designating them and members of their families as representatives of a class comprising all persons who had not filed an asbestos-related lawsuit against a CCR defendant as of the date the class action commenced, but who (1) had been exposed—occupationally or through the occupational exposure of a spouse or household member—to asbestos or products containing asbestos attributable to a CCR defendant, or (2) whose spouse or family member had been so exposed.[5] Untold numbers of individuals may fall within this description. All named plaintiffs alleged that they or a member of their family had been exposed to asbestos-containing products of

---

[4] Also on the same day, the CCR defendants filed a third-party action against their insurers, seeking a declaratory judgment holding the insurers liable for the costs of the settlement. The insurance litigation, upon which implementation of the settlement is conditioned, is still pending in the District Court. See, e. g., Georgine v. Amchem Prods., Inc., No. 93-0215, 1994 WL 502475 (ED Pa., Sept. 2, 1994) (denying motion of insurers to compel discovery).

[5] The complaint defines the class as follows:

"(a) All persons (or their legal representatives) who have been exposed in the United States or its territories (or while working aboard U. S. military, merchant, or passenger ships), either occupationally or through the occupational exposure of a spouse or household member, to asbestos or to asbestos-containing products for which one or more of the Defendants may bear legal liability and who, as of January 15, 1993, reside in the United States or its territories, and who have not, as of January 15, 1993, filed a lawsuit for asbestos-related personal injury, or damage, or death in any state or federal court against the Defendant(s) (or against entities for whose actions or omissions the Defendant(s) bear legal liability).

"(b) All spouses, parents, children, and other relatives (or their legal representatives) of the class members described in paragraph (a) above who have not, as of January 15, 1993, filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph (a) above in any state or federal court against the Defendant(s) (or against entities for whose actions or omissions the Defendant(s) bear legal liability)." 1 App. 13–14.

CCR defendants. More than half of the named plaintiffs alleged that they or their family members had already suffered various physical injuries as a result of the exposure. The others alleged that they had not yet manifested any asbestos-related condition. The complaint delineated no subclasses; all named plaintiffs were designated as representatives of the class as a whole.

The complaint invoked the District Court's diversity jurisdiction and asserted various state-law claims for relief, including (1) negligent failure to warn, (2) strict liability, (3) breach of express and implied warranty, (4) negligent infliction of emotional distress, (5) enhanced risk of disease, (6) medical monitoring, and (7) civil conspiracy. Each plaintiff requested unspecified damages in excess of $100,000. CCR defendants' answer denied the principal allegations of the complaint and asserted 11 affirmative defenses.

A stipulation of settlement accompanied the pleadings; it proposed to settle, and to preclude nearly all class members from litigating against CCR companies, all claims not filed before January 15, 1993, involving compensation for present and future asbestos-related personal injury or death. An exhaustive document exceeding 100 pages, the stipulation presents in detail an administrative mechanism and a schedule of payments to compensate class members who meet defined asbestos-exposure and medical requirements. The stipulation describes four categories of compensable disease: mesothelioma; lung cancer; certain "other cancers" (colon-rectal, laryngeal, esophageal, and stomach cancer); and "non-malignant conditions" (asbestosis and bilateral pleural thickening). Persons with "exceptional" medical claims—claims that do not fall within the four described diagnostic categories—may in some instances qualify for compensation, but the settlement caps the number of "exceptional" claims CCR must cover.

For each qualifying disease category, the stipulation specifies the range of damages CCR will pay to qualifying claim-

ants. Payments under the settlement are not adjustable for inflation. Mesothelioma claimants—the most highly compensated category—are scheduled to receive between $20,000 and $200,000. The stipulation provides that CCR is to propose the level of compensation within the prescribed ranges; it also establishes procedures to resolve disputes over medical diagnoses and levels of compensation.

Compensation above the fixed ranges may be obtained for "extraordinary" claims. But the settlement places both numerical caps and dollar limits on such claims.[6] The settlement also imposes "case flow maximums," which cap the number of claims payable for each disease in a given year.

Class members are to receive no compensation for certain kinds of claims, even if otherwise applicable state law recognizes such claims. Claims that garner no compensation under the settlement include claims by family members of asbestos-exposed individuals for loss of consortium, and claims by so-called "exposure-only" plaintiffs for increased risk of cancer, fear of future asbestos-related injury, and medical monitoring. "Pleural" claims, which might be asserted by persons with asbestos-related plaques on their lungs but no accompanying physical impairment, are also excluded. Although not entitled to present compensation, exposure-only claimants and pleural claimants may qualify for benefits when and if they develop a compensable disease and meet the relevant exposure and medical criteria. Defendants forgo defenses to liability, including statute of limitations pleas.

Class members, in the main, are bound by the settlement in perpetuity, while CCR defendants may choose to with-

---

[6] Only three percent of the qualified mesothelioma, lung cancer, and "other cancer" claims, and only one percent of the total number of qualified "non-malignant condition" claims can be designated "extraordinary." Average expenditures are specified for claims found "extraordinary"; mesothelioma victims with compensable extraordinary claims, for example, receive, on average, $300,000.

draw from the settlement after ten years. A small number of class members—only a few per year—may reject the settlement and pursue their claims in court. Those permitted to exercise this option, however, may not assert any punitive damages claim or any claim for increased risk of cancer. Aspects of the administration of the settlement are to be monitored by the AFL–CIO and class counsel. Class counsel are to receive attorneys' fees in an amount to be approved by the District Court.

### D

On January 29, 1993, as requested by the settling parties, the District Court conditionally certified, under Federal Rule of Civil Procedure 23(b)(3), an encompassing opt-out class. The certified class included persons occupationally exposed to defendants' asbestos products, and members of their families, who had not filed suit as of January 15. Judge Weiner appointed Locks, Motley, and Rice as class counsel, noting that "[t]he Court may in the future appoint additional counsel if it is deemed necessary and advisable." Record, Doc. 11, p. 3 (Class Certification Order). At no stage of the proceedings, however, were additional counsel in fact appointed. Nor was the class ever divided into subclasses. In a separate order, Judge Weiner assigned to Judge Reed, also of the Eastern District of Pennsylvania, "the task of conducting fairness proceedings and of determining whether the proposed settlement is fair to the class." See 157 F. R. D., at 258. Various class members raised objections to the settlement stipulation, and Judge Weiner granted the objectors full rights to participate in the subsequent proceedings. *Ibid.*[7]

---

[7] These objectors, now respondents before this Court, include three groups of individuals with overlapping interests, designated as the "Windsor Group," the New Jersey "White Lung Group," and the "Cargile Group." Margaret Balonis, an individual objector, is also a respondent before this Court. Balonis states that her husband, Casimir, was exposed to asbestos in the late 1940's and was diagnosed with mesothelioma in May

In preliminary rulings, Judge Reed held that the District Court had subject-matter jurisdiction, see *Carlough* v. *Amchem Products, Inc.,* 834 F. Supp. 1437, 1467–1468 (ED Pa. 1993), and he approved the settling parties' elaborate plan for giving notice to the class, see *Carlough* v. *Amchem Products, Inc.,* 158 F. R. D. 314, 336 (ED Pa. 1993). The court-approved notice informed recipients that they could exclude themselves from the class, if they so chose, within a three-month opt-out period.

Objectors raised numerous challenges to the settlement. They urged that the settlement unfairly disadvantaged those without currently compensable conditions in that it failed to adjust for inflation or to account for changes, over time, in medical understanding. They maintained that compensation levels were intolerably low in comparison to awards available in tort litigation or payments received by the inventory plaintiffs. And they objected to the absence of any compensation for certain claims, for example, medical monitoring, compensable under the tort law of several States. Rejecting these and all other objections, Judge Reed concluded that the settlement terms were fair and had been negotiated without collusion. See 157 F. R. D., at 325, 331–332. He also found that adequate notice had been given to class members, see *id.,* at 332–334, and that final class certification under Rule 23(b)(3) was appropriate, see *id.,* at 315.

As to the specific prerequisites to certification, the District Court observed that the class satisfied Rule 23(a)(1)'s numerosity requirement,[8] see *ibid.,* a matter no one debates. The

---

1994, after expiration of the opt-out period, see *infra* this page and 608. The Balonises sued CCR members in Maryland state court, but were charged with civil contempt for violating the Federal District Court's anti-suit injunction. Casimir Balonis died in October 1996. See Brief for Balonis Respondents 9–11.

[8] Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."

Rule 23(a)(2) and (b)(3) requirements of commonality[9] and preponderance[10] were also satisfied, the District Court held, in that

> "[t]he members of the class have all been exposed to asbestos products supplied by the defendants and all share an interest in receiving prompt and fair compensation for their claims, while minimizing the risks and transaction costs inherent in the asbestos litigation process as it occurs presently in the tort system. Whether the proposed settlement satisfies this interest and is otherwise a fair, reasonable and adequate compromise of the claims of the class is a predominant issue for purposes of Rule 23(b)(3)." *Id.*, at 316.

The District Court held next that the claims of the class representatives were "typical" of the class as a whole, a requirement of Rule 23(a)(3),[11] and that, as Rule 23(b)(3) demands,[12] the class settlement was "superior" to other methods of adjudication. See *ibid.*

Strenuous objections had been asserted regarding the adequacy of representation, a Rule 23(a)(4) requirement.[13] Objectors maintained that class counsel and class representatives had disqualifying conflicts of interests. In particular, objectors urged, claimants whose injuries had become manifest and claimants without manifest injuries should not have common counsel and should not be aggregated in a single

---

[9] Rule 23(a)(2) requires that there be "questions of law or fact common to the class."

[10] Rule 23(b)(3) requires that "the [common] questions of law or fact . . . predominate over any questions affecting only individual members."

[11] Rule 23(a)(3) states that "the claims . . . of the representative parties [must be] typical of the claims . . . of the class."

[12] Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy."

[13] Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."

class. Furthermore, objectors argued, lawyers representing inventory plaintiffs should not represent the newly formed class.

Satisfied that class counsel had ably negotiated the settlement in the best interests of all concerned, and that the named parties served as adequate represenuatives, the District Court rejected these objections. See *id.*, at 317–319, 326–332. Subclasses were unnecessary, the District Court held, bearing in mind the added cost and confusion they would entail and the ability of class members to exclude themselves from the class during the three-month opt-out period. See *id.*, at 318–319. Reasoning that the representative plaintiffs "have a strong interest that recovery for *all* of the medical categories be maximized because they may have claims in *any*, or several categories," the District Court found "no antagonism of interest between class members with various medical conditions, or between persons with and without currently manifest asbestos impairment." *Id.*, at 318. Declaring class certification appropriate and the settlement fair, the District Court preliminarily enjoined all class members from commencing any asbestos-related suit against the CCR defendants in any state or federal court. See *Georgine* v. *Amchem Products, Inc.*, 878 F. Supp. 716, 726–727 (ED Pa. 1994).

The objectors appealed. The United States Court of Appeals for the Third Circuit vacated the certification, holding that the requirements of Rule 23 had not been satisfied. See 83 F. 3d 610 (1996).

E

The Court of Appeals, in a long, heavily detailed opinion by Judge Becker, first noted several challenges by objectors to justiciability, subject-matter jurisdiction, and adequacy of notice. These challenges, the court said, raised "serious concerns." *Id.*, at 623. However, the court observed, "the jurisdictional issues in this case would not exist but for the [class-action] certification." *Ibid.* Turning to the class-

certification issues and finding them dispositive, the Third Circuit declined to decide other questions.

On class-action prerequisites, the Court of Appeals referred to an earlier Third Circuit decision, *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F. 3d 768, cert. denied, 516 U. S. 824 (1995) (hereinafter *GM Trucks*), which held that although a class action may be certified for settlement purposes only, Rule 23(a)'s requirements must be satisfied as if the case were going to be litigated. 55 F. 3d, at 799–800. The same rule should apply, the Third Circuit said, to class certification under Rule 23(b)(3). See 83 F. 3d, at 625. But cf. *In re Asbestos Litigation*, 90 F. 3d 963, 975–976, and n. 8 (CA5 1996), cert. pending, Nos. 96–1379, 96–1394. While stating that the requirements of Rule 23(a) and (b)(3) must be met "without taking into account the settlement," 83 F. 3d, at 626, the Court of Appeals in fact closely considered the terms of the settlement as it examined aspects of the case under Rule 23 criteria. See *id.*, at 630–634.

The Third Circuit recognized that Rule 23(a)(2)'s "commonality" requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class "predominate over" other questions. The court therefore trained its attention on the "predominance" inquiry. See *id.*, at 627. The harmfulness of asbestos exposure was indeed a prime factor common to the class, the Third Circuit observed. See *id.*, at 626, 630. But uncommon questions abounded.

In contrast to mass torts involving a single accident, class members in this case were exposed to different asbestos-containing products, in different ways, over different periods, and for different amounts of time; some suffered no physical injury, others suffered disabling or deadly diseases. See *id.*, at 626, 628. "These factual differences," the Third Circuit explained, "translate[d] into significant legal differences." *Id.*, at 627. State law governed and varied widely

on such critical issues as "viability of [exposure-only] claims [and] availability of causes of action for medical monitoring, increased risk of cancer, and fear of future injury." *Ibid.*[14] "[T]he number of uncommon issues in this humongous class action," the Third Circuit concluded, *ibid.*, barred a determination, under existing tort law, that common questions predominated, see *id.*, at 630.

The Court of Appeals next found that "serious intra-class conflicts preclude[d] th[e] class from meeting the adequacy of representation requirement" of Rule 23(a)(4). *Ibid.* Adverting to, but not resolving charges of attorney conflict of interests, the Third Circuit addressed the question whether the named plaintiffs could adequately advance the interests of all class members. The Court of Appeals acknowledged that the District Court was certainly correct to this extent: " '[T]he members of the class are united in seeking the maximum possible recovery for their asbestos-related claims.' " *Ibid.* (quoting 157 F. R. D., at 317). "But the settlement does more than simply provide a general recovery fund," the Court of Appeals immediately added; "[r]ather, it makes important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others." 83 F. 3d, at 630.

In the Third Circuit's view, the "most salient" divergence of interests separated plaintiffs already afflicted with an asbestos-related disease from plaintiffs without manifest injury (exposure-only plaintiffs). The latter would rationally want protection against inflation for distant recoveries. See *ibid.* They would also seek sturdy back-end opt-out rights and "causation provisions that can keep pace with changing

---

[14] Recoveries under the laws of different States spanned a wide range. Objectors assert, for example, that 15 percent of current mesothelioma claims arise in California, where the statewide average recovery is $419,674—or more than 209 percent above the $200,000 maximum specified in the settlement for mesothelioma claims not typed "extraordinary." See Brief for Respondents George Windsor et al. 5–6, n. 5 (citing 2 App. 461).

science and medicine, rather than freezing in place the science of 1993." *Id.*, at 630–631. Already injured parties, in contrast, would care little about such provisions and would rationally trade them for higher current payouts. See *id.*, at 631. These and other adverse interests, the Court of Appeals carefully explained, strongly suggested that an undivided set of representatives could not adequately protect the discrete interests of both currently afflicted and exposure-only claimants.

The Third Circuit next rejected the District Court's determination that the named plaintiffs were "typical" of the class, noting that this Rule 23(a)(3) inquiry overlaps the adequacy of representation question: "both look to the potential for conflicts in the class." *Id.*, at 632. Evident conflict problems, the court said, led it to hold that "no set of representatives can be 'typical' of this class." *Ibid.*

The Court of Appeals similarly rejected the District Court's assessment of the superiority of the class action. The Third Circuit initially noted that a class action so large and complex "could not be tried." *Ibid.* The court elaborated most particularly, however, on the unfairness of binding exposure-only plaintiffs who might be unaware of the class action or lack sufficient information about their exposure to make a reasoned decision whether to stay in or opt out. See *id.*, at 633. "A series of statewide or more narrowly defined adjudications, either through consolidation under Rule 42(a) or as class actions under Rule 23, would seem preferable," the Court of Appeals said. *Id.*, at 634.

The Third Circuit, after intensive review, ultimately ordered decertification of the class and vacation of the District Court's antisuit injunction. *Id.*, at 635. Judge Wellford concurred, "fully subscrib[ing] to the decision of Judge Becker that the plaintiffs in this case ha[d] not met the requirements of Rule 23." *Ibid.* He added that in his view, named exposure-only plaintiffs had no standing to pursue the

suit in federal court, for their depositions showed that "[t]hey claimed no damages and no present injury." *Id.*, at 638.

We granted certiorari, 519 U. S. 957 (1996), and now affirm.

## II

Objectors assert in this Court, as they did in the District Court and Court of Appeals, an array of jurisdictional barriers. Most fundamentally, they maintain that the settlement proceeding instituted by class counsel and CCR is not a justiciable case or controversy within the confines of Article III of the Federal Constitution. In the main, they say, the proceeding is a nonadversarial endeavor to impose on countless individuals without currently ripe claims an administrative compensation regime binding on those individuals if and when they manifest injuries.

Furthermore, objectors urge that exposure-only claimants lack standing to sue: Either they have not yet sustained any cognizable injury or, to the extent the complaint states claims and demands relief for emotional distress, enhanced risk of disease, and medical monitoring, the settlement provides no redress. Objectors also argue that exposure-only claimants did not meet the then-current amount-in-controversy requirement (in excess of $50,000) specified for federal-court jurisdiction based upon diversity of citizenship. See 28 U. S. C. § 1332(a).

As earlier recounted, see *supra*, at 608, the Third Circuit declined to reach these issues because they "would not exist but for the [class-action] certification." 83 F. 3d, at 623. We agree that "[t]he class certification issues are dispositive," *ibid.;* because their resolution here is logically antecedent to the existence of any Article III issues, it is appropriate to reach them first, cf. *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 66–67 (1997) (declining to resolve definitively question whether petitioners had standing because mootness issue was dispositive of the case). We therefore follow the path taken by the Court of Appeals, mindful that

Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure "shall not abridge, enlarge or modify any substantive right," 28 U. S. C. § 2072(b). See also Fed. Rule Civ. Proc. 82 ("rules shall not be construed to extend . . . the [subject-matter] jurisdiction of the United States district courts").[15]

## III

To place this controversy in context, we briefly describe the characteristics of class actions for which the Federal Rules provide. Rule 23, governing federal-court class actions, stems from equity practice and gained its current shape in an innovative 1966 revision. See generally Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L. Rev. 356, 375–400 (1967) (hereinafter Kaplan, Continuing Work). Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").

---

[15] The opinion dissenting in part does not find the class-certification issues dispositive—at least not yet, and would return the case to the Third Circuit for a second look. See *post*, at 630–631, 641. If certification issues were genuinely in doubt, however, the jurisdictional issues would loom larger. Concerning objectors' assertions that exposure-only claimants do not satisfy the $50,000 amount-in-controversy and may have no currently ripe claim, see *Metro-North Commuter R. Co.* v. *Buckley, ante,* p. 424 (Federal Employers' Liability Act, 35 Stat. 65, as amended, 45 U. S. C. § 51 *et seq.*, interpreted in light of common-law principles, does not permit "exposure-only" railworker to recover for negligent infliction of emotional distress or lump-sum damages for costs of medical monitoring).

In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). Rule 23(b)(1) covers cases in which separate actions by or against individual class members would risk establishing "incompatible standards of conduct for the party opposing the class," Fed. Rule Civ. Proc. 23(b)(1)(A), or would "as a practical matter be dispositive of the interests" of nonparty class members "or substantially impair or impede their ability to protect their interests," Rule 23(b)(1)(B). Rule 23(b)(1)(A) "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." Kaplan, Continuing Work 388 (footnotes omitted). Rule 23(b)(1)(B) includes, for example, "limited fund" cases, instances in which numerous persons make claims against a fund insufficient to satisfy all claims. See Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U. S. C. App., pp. 696–697 (hereinafter Adv. Comm. Notes).

Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples. Adv. Comm. Notes, 28 U. S. C. App., p. 697; see Kaplan, Continuing Work 389 (subdivision (b)(2) "build[s] on experience mainly, but not exclusively, in the civil rights field").

In the 1966 class-action amendments, Rule 23(b)(3), the category at issue here, was "the most adventuresome" innovation. See Kaplan, A Prefatory Note, 10 B. C. Ind. & Com. L. Rev. 497, 497 (1969) (hereinafter Kaplan, Prefatory Note). Rule 23(b)(3) added to the complex-litigation arsenal class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be

excluded. See 7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1777, p. 517 (2d ed. 1986) (hereinafter Wright, Miller, & Kane); see generally Kaplan, Continuing Work 379–400. Rule 23(b)(3) "opt-out" class actions superseded the former "spurious" class action, so characterized because it generally functioned as a permissive joinder ("opt-in") device. See 7A Wright, Miller, & Kane § 1753, at 28–31, 42–44; see also Adv. Comm. Notes, 28 U. S. C. App., p. 695.

Framed for situations in which "class-action treatment is not as clearly called for" as it is in Rule 23(b)(1) and (b)(2) situations, Rule 23(b)(3) permits certification where class suit "may nevertheless be convenient and desirable." Adv. Comm. Notes, 28 U. S. C. App., p. 697. To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must "predominate over any questions affecting only individual members"; and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." In adding "predominance" and "superiority" to the qualification-for-certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Ibid.* Sensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other, the Reporter for the 1966 amendments cautioned: "The new provision invites a close look at the case before it is accepted as a class action . . . ." Kaplan, Continuing Work 390.

Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's "close look" at the predominance and superiority criteria:

"(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

In setting out these factors, the Advisory Committee for the 1966 reform anticipated that in each case, courts would "consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit." Adv. Comm. Notes, 28 U. S. C. App., p. 698. They elaborated:

"The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable." Ibid.

See also Kaplan, Continuing Work 391 ("Th[e] interest [in individual control] can be high where the stake of each member bulks large and his will and ability to take care of himself are strong; the interest may be no more than theoretic where the individual stake is so small as to make a separate action impracticable." (footnote omitted)). As the Third Circuit observed in the instant case: "Each plaintiff [in an action involving claims for personal injury and death] has a significant interest in individually controlling the prosecution of [his case]"; each "ha[s] a substantial stake in making individual decisions on whether and when to settle." 83 F. 3d, at 633.

While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." Kaplan, Prefatory Note 497. As concisely recalled in a recent Seventh Circuit opinion:

> "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Mace* v. *Van Ru Credit Corp.*, 109 F. 3d 338, 344 (1997).

To alert class members to their right to "opt out" of a (b)(3) class, Rule 23 instructs the court to "direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. Rule Civ. Proc. 23(c)(2); see *Eisen* v. *Carlisle & Jacquelin*, 417 U. S. 156, 173–177 (1974) (individual notice to class members identifiable through reasonable effort is mandatory in (b)(3) actions; requirement may not be relaxed based on high cost).

No class action may be "dismissed or compromised without [court] approval," preceded by notice to class members. Fed. Rule Civ. Proc. 23(e). The Advisory Committee's sole comment on this terse final provision of Rule 23 restates the Rule's instruction without elaboration: "Subdivision (e) requires approval of the court, after notice, for the dismissal or compromise of any class action." Adv. Comm. Notes, 28 U. S. C. App., p. 699.

In the decades since the 1966 revision of Rule 23, class-action practice has become ever more "adventuresome" as a means of coping with claims too numerous to secure their

"just, speedy, and inexpensive determination" one by one. See Fed. Rule Civ. Proc. 1. The development reflects concerns about the efficient use of court resources and the conservation of funds to compensate claimants who do not line up early in a litigation queue. See generally J. Weinstein, Individual Justice in Mass Tort Litigation: The Effect of Class Actions, Consolidations, and Other Multiparty Devices (1995); Schwarzer, Settlement of Mass Tort Class Actions: Order out of Chaos, 80 Cornell L. Rev. 837 (1995).

Among current applications of Rule 23(b)(3), the "settlement only" class has become a stock device. See, e. g., T. Willging, L. Hooper, & R. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 61–62 (1996) (noting large number of such cases in districts studied). Although all Federal Circuits recognize the utility of Rule 23(b)(3) settlement classes, courts have divided on the extent to which a proffered settlement affects court surveillance under Rule 23's certification criteria.

In *GM Trucks*, 55 F. 3d, at 799–800, and in the instant case, 83 F. 3d, at 624–626, the Third Circuit held that a class cannot be certified for settlement when certification for trial would be unwarranted. Other courts have held that settlement obviates or reduces the need to measure a proposed class against the enumerated Rule 23 requirements. See, e. g., *In re Asbestos Litigation*, 90 F. 3d, at 975 (CA5) ("in settlement class context, common issues arise from the settlement itself") (citing H. Newberg & A. Conte, 2 Newberg on Class Actions § 11.28, p. 11–58 (3d ed. 1992)); *White* v. *National Football League*, 41 F. 3d 402, 408 (CA8 1994) ("adequacy of class representation . . . is ultimately determined by the settlement itself"), cert. denied, 515 U. S. 1137 (1995); *In re A. H. Robins Co.*, 880 F. 2d 709, 740 (CA4) ("[i]f not a ground for certification *per se*, certainly settlement should be a factor, and an important factor, to be considered when determining certification"), cert. denied *sub nom. Anderson*

v. *Aetna Casualty & Surety Co.*, 493 U. S. 959 (1989); *Malchman* v. *Davis*, 761 F. 2d 893, 900 (CA2 1985) (certification appropriate, in part, because "the interests of the members of the broadened class in the settlement agreement were commonly held"), cert. denied, 475 U. S. 1143 (1986).

A proposed amendment to Rule 23 would expressly authorize settlement class certification, in conjunction with a motion by the settling parties for Rule 23(b)(3) certification, "even though the requirements of subdivision (b)(3) might not be met for purposes of trial." Proposed Amendment to Fed. Rule Civ. Proc. 23(b), 117 S. Ct. No. 1 CXIX, CLIV to CLV (Aug. 1996) (Request for Comment). In response to the publication of this proposal, voluminous public comments—many of them opposed to, or skeptical of, the amendment—were received by the Judicial Conference Standing Committee on Rules of Practice and Procedure. See, *e. g.*, Letter from Steering Committee to Oppose Proposed Rule 23, signed by 129 law professors (May 28, 1996); Letter from Paul D. Carrington (May 21, 1996). The Committee has not yet acted on the matter. We consider the certification at issue under the Rule as it is currently framed.

## IV

We granted review to decide the role settlement may play, under existing Rule 23, in determining the propriety of class certification. The Third Circuit's opinion stated that each of the requirements of Rule 23(a) and (b)(3) "must be satisfied without taking into account the settlement." 83 F. 3d, at 626 (quoting *GM Trucks*, 55 F. 3d, at 799). That statement, petitioners urge, is incorrect.

We agree with petitioners to this limited extent: Settlement is relevant to a class certification. The Third Circuit's opinion bears modification in that respect. But, as we earlier observed, see *supra*, at 609, the Court of Appeals in fact did not ignore the settlement; instead, that court homed in on settlement terms in explaining why it found the absentees'

interests inadequately represented. See 83 F. 3d, at 630–631. The Third Circuit's close inspection of the settlement in that regard was altogether proper.

Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial. But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold. See Rule 23(c), (d).[16]

And, of overriding importance, courts must be mindful that the Rule as now composed sets the requirements they are bound to enforce. Federal Rules take effect after an extensive deliberative process involving many reviewers: a Rules Advisory Committee, public commenters, the Judicial Conference, this Court, the Congress. See 28 U. S. C. §§ 2073, 2074. The text of a rule thus proposed and reviewed limits judicial inventiveness. Courts are not free to amend a rule outside the process Congress ordered, a process properly tuned to the instruction that rules of procedure "shall not abridge . . . any substantive right." § 2072(b).

Rule 23(e), on settlement of class actions, reads in its entirety: "A class action shall not be dismissed or compromised

---

[16] Portions of the opinion dissenting in part appear to assume that settlement counts only one way—in favor of certification. See *post*, at 629, 630, 641. But see *post*, at 635. To the extent that is the dissent's meaning, we disagree. Settlement, though a relevant factor, does not inevitably signal that class-action certification should be granted more readily than it would be were the case to be litigated. For reasons the Third Circuit aired, see 83 F. 3d 610, 626–635 (1996), proposed settlement classes sometimes warrant more, not less, caution on the question of certification.

without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." This prescription was designed to function as an additional requirement, not a superseding direction, for the "class action" to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b). Cf. *Eisen*, 417 U. S., at 176–177 (adequate representation does not eliminate additional requirement to provide notice). Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed.

The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments—checks shorn of utility—in the settlement-class context. First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind—class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.

Second, if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed. Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer, see Coffee, Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1379–1380 (1995), and the court would face a bargain proffered for its approval without benefit of adversarial investigation, see, *e. g., Kamilewicz* v. *Bank of Boston Corp.*, 100 F. 3d 1348, 1352 (CA7 1996) (Easterbrook, J., dissenting from denial of rehearing en banc) (parties "may even put one over on the court, in a staged performance"), cert. denied, 520 U. S. 1204 (1997).

Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is "fair," then certification is proper. Applying to this case criteria the rulemakers set, we conclude that the Third Circuit's appraisal is essentially correct. Although that court should have acknowledged that settlement is a factor in the calculus, a remand is not warranted on that account. The Court of Appeals' opinion amply demonstrates why—with or without a settlement on the table—the sprawling class the District Court certified does not satisfy Rule 23's requirements.[17]

## A

We address first the requirement of Rule 23(b)(3) that "[common] questions of law or fact . . . predominate over any questions affecting only individual members." The District Court concluded that predominance was satisfied based on two factors: class members' shared experience of asbestos exposure and their common "interest in receiving prompt and fair compensation for their claims, while minimizing the risks and transaction costs inherent in the asbestos litigation process as it occurs presently in the tort system." 157 F. R. D., at 316. The settling parties also contend that the settlement's fairness is a common question, predominating over disparate legal issues that might be pivotal in litigation but become irrelevant under the settlement.

The predominance requirement stated in Rule 23(b)(3), we hold, is not met by the factors on which the District Court relied. The benefits asbestos-exposed persons might gain from the establishment of a grand-scale compensation scheme is a matter fit for legislative consideration, see *supra*,

---

[17] We do not inspect and set aside for insufficient evidence District Court findings of fact. Cf. *post*, at 633, 637–638. Rather, we focus on the requirements of Rule 23, and endeavor to explain why those requirements cannot be met for a class so enormously diverse and problematic as the one the District Court certified.

at 598, but it is not pertinent to the predominance inquiry. That inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.[18]

The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. See 7A Wright, Miller, & Kane 518–519.[19] The inquiry appropriate under Rule 23(e), on the other hand, protects unnamed class members "from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise." See 7B Wright, Miller, & Kane § 1797, at 340–341. But it is not the mission of Rule 23(e) to assure the class cohesion that legitimizes representative action in the first place. If a common interest in a fair compromise could satisfy the predominance requirement of Rule 23(b)(3), that vital prescription would be stripped of any meaning in the settlement context.

The District Court also relied upon this commonality: "The members of the class have all been exposed to asbestos products supplied by the defendants . . . ." 157 F. R. D., at 316. Even if Rule 23(a)'s commonality requirement may be satis-

---

[18] In this respect, the predominance requirement of Rule 23(b)(3) is similar to the requirement of Rule 23(a)(3) that "claims or defenses" of the named representatives must be "typical of the claims or defenses of the class." The words "claims or defenses" in this context—just as in the context of Rule 24(b)(2) governing permissive intervention—"manifestly refer to the kinds of claims or defenses that can be raised in courts of law as part of an actual or impending law suit." Diamond v. Charles, 476 U. S. 54, 76–77 (1986) (O'CONNOR, J., concurring in part and concurring in judgment).

[19] This case, we note, involves no "limited fund" capable of supporting class treatment under Rule 23(b)(1)(B), which does not have a predominance requirement. See Georgine v. Amchem Products, Inc., 157 F. R. D. 246, 318 (ED Pa. 1994); see also id., at 291, and n. 40. The settling parties sought to proceed exclusively under Rule 23(b)(3).

fied by that shared experience, the predominance criterion is far more demanding. See 83 F. 3d, at 626–627. Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard.

The Third Circuit highlighted the disparate questions undermining class cohesion in this case:

> "Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma . . . . Each has a different history of cigarette smoking, a factor that complicates the causation inquiry.

> "The [exposure-only] plaintiffs especially share little in common, either with each other or with the presently injured class members. It is unclear whether they will contract asbestos-related disease and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories." *Id.*, at 626.

Differences in state law, the Court of Appeals observed, compound these disparities. See *id.*, at 627 (citing *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 823 (1985)).

No settlement class called to our attention is as sprawling as this one. Cf. *In re Asbestos Litigation*, 90 F. 3d, at 976, n. 8 ("We would likely agree with the Third Circuit that a class action requesting individual damages for members of a global class of asbestos claimants would not satisfy [Rule 23] requirements due to the huge number of individuals and

their varying medical expenses, smoking histories, and family situations."). Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws. See Adv. Comm. Notes, 28 U. S. C. App., p. 697; see also *supra*, at 615, 616. Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement. The Advisory Committee for the 1966 revision of Rule 23, it is true, noted that "mass accident" cases are likely to present "significant questions, not only of damages but of liability and defenses of liability, . . . affecting the individuals in different ways." Adv. Comm. Notes, 28 U. S. C. App., p. 697. And the Committee advised that such cases are "ordinarily not appropriate" for class treatment. *Ibid.* But the text of the Rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number. See Resnik, From "Cases" to "Litigation," 54 Law & Contemp. Prob. 5, 17–19 (Summer 1991) (describing trend). The Committee's warning, however, continues to call for caution when individual stakes are high and disparities among class members great. As the Third Circuit's opinion makes plain, the certification in this case does not follow the counsel of caution. That certification cannot be upheld, for it rests on a conception of Rule 23(b)(3)'s predominance requirement irreconcilable with the Rule's design.

## B

Nor can the class approved by the District Court satisfy Rule 23(a)(4)'s requirement that the named parties "will fairly and adequately protect the interests of the class." The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. See *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 157–158, n. 13 (1982). "[A] class representative must be part of the class and 'pos-

sess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc.* v. *Rodriguez*, 431 U. S. 395, 403 (1977) (quoting *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 216 (1974)).[20]

As the Third Circuit pointed out, named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future. Cf. *General Telephone Co. of Northwest* v. *EEOC*, 446 U. S. 318, 331 (1980) ("In employment discrimination litigation, conflicts might arise, for example, between employees and applicants who were denied employment and who will, if granted relief, compete with employees for fringe benefits or seniority. Under Rule 23, the same plaintiff could not represent these classes.").

The disparity between the currently injured and exposure-only categories of plaintiffs, and the diversity within each category are not made insignificant by the District Court's finding that petitioners' assets suffice to pay claims under the settlement. See 157 F. R. D., at 291. Al-

---

[20] The adequacy-of-representation requirement "tend[s] to merge" with the commonality and typicality criteria of Rule 23(a), which "serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 157, n. 13 (1982). The adequacy heading also factors in competency and conflicts of class counsel. See *id.*, at 157–158, n. 13. Like the Third Circuit, we decline to address adequacy-of-counsel issues discretely in light of our conclusions that common questions of law or fact do not predominate and that the named plaintiffs cannot adequately represent the interests of this enormous class.

though this is not a "limited fund" case certified under Rule 23(b)(1)(B), the terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability. For example, as earlier described, see *supra*, at 604–605, the settlement includes no adjustment for inflation; only a few claimants per year can opt out at the back end; and loss-of-consortium claims are extinguished with no compensation.

The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency. In another asbestos class action, the Second Circuit spoke precisely to this point:

> "[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 982 F. 2d 721, 742–743 (1992), modified on reh'g *sub nom. In re Findley*, 993 F. 2d 7 (1993).

The Third Circuit found no assurance here—either in the terms of the settlement or in the structure of the negotiations—that the named plaintiffs operated under a proper understanding of their representational responsibilities. See

83 F. 3d, at 630–631. That assessment, we conclude, is on the mark.

## C

Impediments to the provision of adequate notice, the Third Circuit emphasized, rendered highly problematic any endeavor to tie to a settlement class persons with no perceptible asbestos-related disease at the time of the settlement. *Id.*, at 633; cf. *In re Asbestos Litigation,* 90 F. 3d, at 999–1000 (Smith, J., dissenting). Many persons in the exposure-only category, the Court of Appeals stressed, may not even know of their exposure, or realize the extent of the harm they may incur. Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out.

Family members of asbestos-exposed individuals may themselves fall prey to disease or may ultimately have ripe claims for loss of consortium. Yet large numbers of people in this category—future spouses and children of asbestos victims—could not be alerted to their class membership. And current spouses and children of the occupationally exposed may know nothing of that exposure.

Because we have concluded that the class in this case cannot satisfy the requirements of common issue predominance and adequacy of representation, we need not rule, definitively, on the notice given here. In accord with the Third Circuit, however, see 83 F. 3d, at 633–634, we recognize the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous.

## V

The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of as-

bestos exposure.[21]   Congress, however, has not adopted such a solution.   And Rule 23, which must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view, cannot carry the large load CCR, class counsel, and the District Court heaped upon it.   As this case exemplifies, the rulemakers' prescriptions for class actions may be endangered by "those who embrace [Rule 23] too enthusiastically just as [they are by] those who approach [the Rule] with distaste."   C. Wright, Law of Federal Courts 508 (5th ed. 1994); cf. 83 F. 3d, at 634 (suggesting resort to less bold aggregation techniques, including more narrowly defined class certifications).

\*     \*     \*

For the reasons stated, the judgment of the Court of Appeals for the Third Circuit is

*Affirmed.*

JUSTICE O'CONNOR took no part in the consideration or decision of this case.

JUSTICE BREYER, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

Although I agree with the Court's basic holding that "[s]ettlement is relevant to a class certification," *ante,* at 619, I find several problems in its approach that lead me to a different conclusion.   First, I believe that the need for settlement in this mass tort case, with hundreds of thousands of lawsuits, is greater than the Court's opinion suggests.   Second, I would give more weight than would the majority to settlement-related issues for purposes of determining whether common issues predominate.   Third, I am uncertain about the Court's determination of adequacy of representa-

---

[21] The opinion dissenting in part is a forceful statement of that argument.

tion, and do not believe it appropriate for this Court to second-guess the District Court on the matter without first having the Court of Appeals consider it. Fourth, I am uncertain about the tenor of an opinion that seems to suggest the settlement is unfair. And fifth, in the absence of further review by the Court of Appeals, I cannot accept the majority's suggestions that "notice" is inadequate.

These difficulties flow from the majority's review of what are highly fact-based, complex, and difficult matters, matters that are inappropriate for initial review before this Court. The law gives broad leeway to district courts in making class certification decisions, and their judgments are to be reviewed by the court of appeals only for abuse of discretion. See *Califano* v. *Yamasaki*, 442 U. S. 682, 703 (1979). Indeed, the District Court's certification decision rests upon more than 300 findings of fact reached after five weeks of comprehensive hearings. Accordingly, I do not believe that we should in effect set aside the findings of the District Court. That court is far more familiar with the issues and litigants than is a court of appeals or are we, and therefore has "broad power and discretion . . . with respect to matters involving the certification" of class actions. *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 345 (1979); cf. *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 402 (1990) (district court better situated to make fact-dependent legal determinations in Rule 11 context).

I do not believe that we can rely upon the Court of Appeals' review of the District Court record, for that review, and its ultimate conclusions, are infected by a legal error. *E. g.*, *Georgine* v. *Amchem Products, Inc.*, 83 F. 3d 610, 626 (CA3 1996) (holding that "*considered as a litigation class*," the class cannot meet Federal Rule of Civil Procedure 23's requirements (emphasis added)). There is no evidence that the Court of Appeals at any point considered the settlement as something that would help the class meet Rule 23. I find, moreover, the fact-related issues presented here sufficiently

close to warrant further detailed appellate court review under the correct legal standard. Cf. *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 486 (1997). And I shall briefly explain why this is so.

I

First, I believe the majority understates the importance of settlement in this case. Between 13 and 21 million workers have been exposed to asbestos in the workplace—over the past 40 or 50 years—but the most severe instances of such exposure probably occurred three or four decades ago. See Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation, pp. 6–7 (Mar. 1991) (Judicial Conference Report); App. 781–782, 801; B. Castleman, Asbestos: Medical and Legal Aspects 787–788 (4th ed. 1996). This exposure has led to several hundred thousand lawsuits, about 15% of which involved claims for cancer and about 30% for asbestosis. See *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 129 B. R. 710, 936–937 (E and SD N. Y. 1991). About half of the suits have involved claims for pleural thickening and plaques—the harmfulness of which is apparently controversial. (One expert below testified that they "don't transform into cancer" and are not "predictor[s] of future disease," App. 781.) Some of those who suffer from the most serious injuries, however, have received little or no compensation. *In re School Asbestos Litigation*, 789 F. 2d 996, 1000 (CA3 1986); see also Edley & Weiler, Asbestos: A Multi-Billion-Dollar Crisis, 30 Harv. J. Legis. 383, 384, 393 (1993) ("[U]p to one-half of asbestos claims are now being filed by people who have little or no physical impairment. Many of these claims produce substantial payments (and substantial costs) even though the individual litigants will never become impaired"). These lawsuits have taken up more than 6% of all federal civil filings in one recent year, and are subject to a delay that is twice that of other civil suits. Judicial Conference Report 7, 10–11.

Delays, high costs, and a random pattern of noncompensation led the Judicial Conference Ad Hoc Committee on Asbestos Litigation to transfer all federal asbestos personal-injury cases to the Eastern District of Pennsylvania in an effort to bring about a fair and comprehensive settlement. It is worth considering a few of the Committee's comments. See Judicial Conference Report 2 ("'Decisions concerning thousands of deaths, millions of injuries, and billions of dollars are entangled in a litigation system whose strengths have increasingly been overshadowed by its weaknesses.' The ensuing five years have seen the picture worsen: increased filings, larger backlogs, higher costs, more bankruptcies and poorer prospects that judgments—if ever obtained—can be collected" (quoting Rand Corporation Institute for Civil Justice)); id., at 13 ("The transaction costs associated with asbestos litigation are an unconscionable burden on the victims of asbestos disease." "[O]f each asbestos litigation dollar, 61 cents is consumed in transaction costs .... Only 39 cents were paid to the asbestos victims" (citing Rand finding)); id., at 12 ("Delays also can increase transaction costs, especially the attorneys' fees paid by defendants at hourly rates. These costs reduce either the insurance fund or the company's assets, thereby reducing the funds available to pay pending and future claimants. By the end of the trial phase in [one case], at least seven defendants had declared bankruptcy (as a result of asbestos claims generally")); see also J. Weinstein, Individual Justice in Mass Tort Litigation 155 (1995); Edley & Weiler, supra, at 389–395.

Although the transfer of the federal asbestos cases did not produce a general settlement, it was intertwined with and led to a lengthy year-long negotiation between the cochairs of the Plaintiff's Multi-District Litigation Steering Committee (elected by the Plaintiff's Committee Members and approved by the District Court) and the 20 asbestos defendants who are before us here. Georgine v. Amchem Products, Inc., 157 F. R. D. 246, 266–267 (ED Pa. 1994); App. 660–662.

These "protracted and vigorous" negotiations led to the present partial settlement, which will pay an estimated $1.3 billion and compensate perhaps 100,000 class members in the first 10 years. 157 F. R. D., at 268, 287. "The negotiations included a substantial exchange of information" between class counsel and the 20 defendant companies, including "confidential data" showing the defendants' historical settlement averages, numbers of claims filed and settled, and insurance resources. *Id.,* at 267. "Virtually no provision" of the settlement "was not the subject of significant negotiation," and the settlement terms "changed substantially" during the negotiations. *Ibid.* In the end, the negotiations produced a settlement that, the District Court determined based on its detailed review of the process, was "the result of arms-length adversarial negotiations by extraordinarily competent and experienced attorneys." *Id.,* at 335.

The District Court, when approving the settlement, concluded that it improved the plaintiffs' chances of compensation and reduced total legal fees and other transaction costs by a significant amount. Under the previous system, according to the court, "[t]he sickest of victims often go uncompensated for years while valuable funds go to others who remain unimpaired by their mild asbestos disease." *Ibid.* The court believed the settlement would create a compensation system that would make more money available for plaintiffs who later develop serious illnesses.

I mention this matter because it suggests that the settlement before us is unusual in terms of its importance, both to many potential plaintiffs and to defendants, and with respect to the time, effort, and expenditure that it reflects. All of which leads me to be reluctant to set aside the District Court's findings without more assurance than I have that they are wrong. I cannot obtain that assurance through comprehensive review of the record because that is properly the job of the Court of Appeals and that court, understandably, but as we now hold, mistakenly, believed that settle-

ment was not a relevant (and, as I would say, important) consideration.

Second, the majority, in reviewing the District Court's determination that common "issues of fact and law predominate," says that the predominance "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Ante*, at 623 (footnote omitted). I find it difficult to interpret this sentence in a way that could lead me to the majority's conclusion. If the majority means that these presettlement questions are what matters, then how does it reconcile its statement with its basic conclusion that "settlement is relevant" to class certification, or with the numerous lower court authority that says that settlement is not only relevant, but important? See, *e. g., In re A. H. Robins Co.*, 880 F. 2d 709, 740 (CA4), cert. denied *sub nom. Anderson* v. *Aetna Casualty & Surety Co.*, 493 U. S. 959 (1989); *In re Beef Industry Antitrust Litigation*, 607 F. 2d 167, 177–178 (CA5 1979), cert. denied *sub nom. Iowa Beef Processors, Inc.* v. *Meat Price Investigators Assn.*, 452 U. S. 905 (1981); 2 H. Newberg & A. Conte, Newberg on Class Actions § 11.27, pp. 11–54 to 11–55 (3d ed. 1992).

Nor do I understand how one could decide whether common questions "predominate" in the abstract—without looking at what is likely to be at issue in the proceedings that will ensue, namely, the settlement. Every group of human beings, after all, has some features in common, and some that differ. How can a court make a contextual judgment of the sort that Rule 23 requires without looking to what proceedings will follow? Such guideposts help it decide whether, in light of common concerns and differences, certification will achieve Rule 23's basic objective—"economies of time, effort, and expense." Advisory Committee's Notes on Fed. Rule Civ. Proc. 23(b)(3), 28 U. S. C. App., p. 697. As this Court has previously observed, "sometimes it may be necessary for the court to probe behind the pleadings before coming to

rest on the certification question." *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 160 (1982); see also 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1785, p. 107, and n. 34 (1986). I am not saying that the "settlement counts only one way." *Ante*, at 620, n. 16. Rather, the settlement may simply "add a great deal of information to the court's inquiry and will often expose diverging interests or common issues that were not evident or clear from the complaint" and courts "can and should" look to it to enhance the "ability . . . to make informed certification decisions." *In re Asbestos Litigation*, 90 F. 3d 963, 975 (CA5 1996).

The majority may mean that the District Court gave too much weight to the settlement. But I am not certain how it can reach that conclusion. It cannot rely upon the Court of Appeals, for that court gave no positive weight at all to the settlement. Nor can it say that the District Court relied solely on "a common interest in a fair compromise," *ante*, at 623, for the District Court did not do so. Rather, it found the settlement relevant because it explained the importance of the class plaintiffs' common features and common interests. The court found predominance in part because:

> "The members of the class have all been exposed to asbestos products supplied by the defendants and all share an interest in receiving prompt and fair compensation for their claims, while minimizing the risks and transaction costs inherent in the asbestos litigation process as it occurs presently in the tort system." 157 F. R. D., at 316.

The settlement is relevant because it means that these common features and interests are likely to be important in the proceeding that would ensue—a proceeding that would focus primarily upon whether or not the proposed settlement fairly and properly satisfied the interests class members had in common. That is to say, the settlement underscored the im-

portance of (a) the common fact of exposure, (b) the common interest in receiving *some* compensation for certain rather than running a strong risk of *no* compensation, and (c) the common interest in avoiding large legal fees, other transaction costs, and delays. *Ibid.*

Of course, as the majority points out, there are also important differences among class members. Different plaintiffs were exposed to different products for different times; each has a distinct medical history and a different history of smoking; and many cases arise under the laws of different States. The relevant question, however, is *how much* these differences matter in respect to the legal proceedings that lie ahead. Many, if not all, toxic tort class actions involve plaintiffs with such differences. And the differences in state law are of diminished importance in respect to a proposed settlement in which the defendants have waived all defenses and agreed to compensate all those who were injured. *Id.*, at 292.

These differences might warrant subclasses, though subclasses can have problems of their own. "There can be a cost in creating more distinct subgroups, each with its own representation. . . . [T]he more subclasses created, the more severe conflicts bubble to the surface and inhibit settlement. . . . The resources of defendants and, ultimately, the community must not be exhausted by protracted litigation." Weinstein, Individual Justice in Mass Tort Litigation, at 66. Or these differences may be too serious to permit an effort at group settlement. This kind of determination, as I have said, is one that the law commits to the discretion of the district court—reviewable for abuse of discretion by a court of appeals. I believe that we are far too distant from the litigation itself to reweigh the fact-specific Rule 23 determinations and to find them erroneous without the benefit of the Court of Appeals first having restudied the matter with today's legal standard in mind.

Third, the majority concludes that the "representative parties" will not "fairly and adequately protect the interests of the class." Rule 23(a)(4). It finds a serious conflict between plaintiffs who are now injured and those who may be injured in the future because "for the currently injured, the critical goal is generous immediate payments," a goal that "tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." *Ante*, at 626.

I agree that there is a serious problem, but it is a problem that often exists in toxic tort cases. See Weinstein, *supra*, at 64 (noting that conflict "between present and future claimants" "is almost always present in some form in mass tort cases because long latency periods are needed to discover injuries"); see also Judicial Conference Report 34–35 ("Because many of the defendants in these cases have limited assets that may be called upon to satisfy the judgments obtained under current common tort rules and remedies, there is a 'real and present danger that the available assets will be exhausted before those later victims can seek compensation to which they are entitled'" (citation omitted)). And it is a problem that potentially exists whenever a single defendant injures several plaintiffs, for a settling plaintiff leaves fewer assets available for the others. With class actions, at least, plaintiffs have the consolation that a district court, thoroughly familiar with the facts, is charged with the responsibility of ensuring that the interests of no class members are sacrificed.

But this Court cannot easily safeguard such interests through review of a cold record. "What constitutes adequate representation is a question of fact that depends on the circumstances of each case." 7A Wright, Miller, & Kane, Federal Practice and Procedure § 1765, at 271. That is particularly so when, as here, there is an unusual baseline, namely, the "'real and present danger'" described by the Judicial Conference Report above. The majority's use of the

lack of an inflation adjustment as evidence of inadequacy of representation for future plaintiffs, *ante*, at 626–627, is one example of this difficulty. An inflation adjustment might not be as valuable as the majority assumes if most plaintiffs are old and not worried about receiving compensation decades from now. There are, of course, strong arguments as to its value. But that disagreement is one that this Court is poorly situated to resolve.

Further, certain details of the settlement that are not discussed in the majority opinion suggest that the settlement may be of greater benefit to future plaintiffs than the majority suggests. The District Court concluded that future plaintiffs receive a "significant value" from the settlement due to a variety of its items that benefit future plaintiffs, such as: (1) tolling the statute of limitations so that class members "will no longer be forced to file premature lawsuits or risk their claims being time-barred"; (2) waiver of defenses to liability; (3) payment of claims, if and when members become sick, pursuant to the settlement's compensation standards, which avoids "the uncertainties, long delays and high transaction costs [including attorney's fees] of the tort system"; (4) "some assurance that there will be funds available if and when they get sick," based on the finding that each defendant "has shown an ability to fund the payment of all qualifying claims" under the settlement; and (5) the right to additional compensation if cancer develops (many settlements for plaintiffs with noncancerous conditions bar such additional claims). 157 F. R. D., at 292. For these reasons, and others, the District Court found that the distinction between present and future plaintiffs was "illusory." *Id.*, at 317–318.

I do not know whether or not the benefits are more or less valuable than an inflation adjustment. But I can certainly recognize an argument that they are. (To choose one more brief illustration, the majority chastises the settlement for extinguishing loss-of-consortium claims, *ante*, at 627, 628, but

does not note that, as the District Court found, the "defendants' historical [settlement] averages, upon which the compensation values are based, include payments for loss of consortium claims, and, accordingly, the Compensation Schedule is not unfair for this ascribed reason," 157 F. R. D., at 278.) The difficulties inherent in both knowing and understanding the vast number of relevant individual fact-based determinations here counsel heavily in favor of deference to district court decisionmaking in Rule 23 decisions. Or, at the least, making certain that appellate court review has taken place with the correct standard in mind.

Fourth, I am more agnostic than is the majority about the basic fairness of the settlement. *Ante*, at 625–628. The District Court's conclusions rested upon complicated factual findings that are not easily cast aside. It is helpful to consider some of them, such as its determination that the settlement provided "fair compensation . . . while reducing the delays and transaction costs endemic to the asbestos litigation process" and that "the proposed class action settlement is superior to other available methods for the fair and efficient resolution of the asbestos-related personal injury claims of class members." 157 F. R. D., at 316 (citation omitted); see also *id.*, at 335 ("The inadequate tort system has demonstrated that the lawyers are well paid for their services but the victims are not receiving speedy and reasonably inexpensive resolution of their claims. Rather, the victims' recoveries are delayed, excessively reduced by transaction costs and relegated to the impersonal group trials and mass consolidations. The sickest of victims often go uncompensated for years while valuable funds go to others who remain unimpaired by their mild asbestos disease. Indeed, these unimpaired victims have, in many states, been forced to assert their claims prematurely or risk giving up all rights to future compensation for any future lung cancer or mesothelioma. The plan which this Court approves today will correct that unfair result for the class members and the . . . defend-

ants"); *id.*, at 279, 280 (settlement "will result in less delay for asbestos claimants than that experienced in the present tort system" and will "result in the CCR defendants paying more claims at a faster rate, than they have ever paid before"); *id.*, at 292; Edley & Weiler, 30 Harv. J. Legis., at 405, 407 (finding that "[t]here are several reasons to believe that this settlement secures important gains for both sides" and that they "firmly endorse the fairness and adequacy of this settlement"). Indeed, the settlement has been endorsed as fair and reasonable by the AFL–CIO (and its Building and Construction Trades Department), which represents a " 'substantial percentage' " of class members, 157 F. R. D., at 325, and which has a role in monitoring implementation of the settlement, *id.*, at 285. I do not intend to pass judgment upon the settlement's fairness, but I do believe that these matters would have to be explored in far greater depth before I could reach a conclusion about fairness. And that task, as I have said, is one for the Court of Appeals.

Finally, I believe it is up to the District Court, rather than this Court, to review the legal sufficiency of notice to members of the class. The District Court found that the plan to provide notice was implemented at a cost of millions of dollars and included hundreds of thousands of individual notices, a wide-ranging television and print campaign, and significant additional efforts by 35 international and national unions to notify their members. *Id.*, at 312–313, 336. Every notice emphasized that an individual did not currently have to be sick to be a class member. And in the end, the District Court was "confident" that Rule 23 and due process requirements were satisfied because, as a result of this "extensive and expensive notice procedure," "over six million" individuals "received actual notice materials," and "millions more" were reached by the media campaign. *Id.*, at 312, 333, 336. Although the majority, in principle, is reviewing a Court of Appeals' conclusion, it seems to me that its opinion might call into question the fact-related determinations of the District

Court. *Ante*, at 628. To the extent that it does so, I disagree, for such findings cannot be so quickly disregarded. And I do not think that our precedents permit this Court to do so. See *Reiter*, 442 U. S., at 345; *Yamasaki*, 442 U. S., at 703.

## II

The issues in this case are complicated and difficult. The District Court might have been correct. Or not. Subclasses might be appropriate. Or not. I cannot tell. And I do not believe that this Court should be in the business of trying to make these fact-based determinations. That is a job suited to the district courts in the first instance, and the courts of appeals on review. But there is no reason in this case to believe that the Court of Appeals conducted its prior review with an understanding that the settlement could have constituted a reasonably strong factor in favor of class certification. For this reason, I would provide the courts below with an opportunity to analyze the factual questions involved in certification by vacating the judgment, and remanding the case for further proceedings.